## VAUGHAN *v.* FORD.

1. CONTRACTS—MODIFICATION—MISREPRESENTATION—ESTIMATE.

   After it was found that the plans for constructing a building were impracticable, the architects provided a new method of constructing the foundation by which for caissons of cement resting on bedrock were substituted piers with bells, which the engineer informed the contractor contained approximately an equal amount of concrete. In fact they contained 1,049 feet more of concrete. *Held*, that the contractor who proceeded to carry on the work under similar terms was entitled to extra compensation for the increased cost.

2. SAME—MECHANIC'S LIEN—EXTRAS.

   Pumping water which an independent contractor caused to flood the basement is properly allowed as an extra expense in a suit to enforce a mechanic's lien.

3. SAME—ACCEPTANCE OF WORK.

   In construing a building contract, it is competent evidence that steel beams were not to be encased in concrete, where it appeared that the architects accepted the work without objection.

4. MECHANIC'S LIEN—EFFECT OF FILING EXCESSIVE CLAIM.

   The filing of an excessive claim in entire good faith does not bar the attaching of a mechanic's lien.

5. SAME—NATURE.

   A mechanic's lien under 3 Comp. Laws, §§ 10710–10745, being a direct lien in behalf of the person entitled to it, not one by subrogation, the claimant is not bound by stipulations in the original contract to which they are not parties except as to the contract price.

6. SAME—RECOUPMENT—DAMAGES.

   A damage suit by an adjoining proprietor against the original contractor whose agreement provides indemnity against such claims, does not bar or restrict a subcontractor in the enforcement of a mechanic's lien when the evidence fails to show a breach or failure of performance of the contract.

Appeal from Wayne; Hosmer, J.   Submitted April 7, 1910.   (Docket No. 7.)   Decided July 14, 1910.

Bill by Jay W. Vaughan and Joseph C. Dumont, co-partners as Vaughan & Dumont, against Edward Ford and Frank H. Goddard to enforce a mechanic's lien. From a decree for complainants, defendants appeal. Affirmed.

*Choate & Webster* (*Leo M. Butzel,* of counsel), for complainants.

*Gray & Gray,* for defendant Ford.

*C. K. Latham* and *W. C. Stuart,* for defendant Goddard.

BLAIR, J.   Complainants filed the bill of complaint in this case to enforce a mechanic's lien against the defendant Ford as owner, and the defendant Goddard as masonry contractor, for the erection of a certain office building known as the "Ford Building," on the northwest corner of Congress and Griswold streets in the city of Detroit.

On the 18th day of September, 1906, Vaughan & Dumont and Goddard entered into a contract, portions of which we quote, as follows:

"Whereas, F. H. Goddard has taken a contract for the erection of a building on the northwest corner of Griswold and Congress streets, in the city of Detroit, Michigan, which contract includes the construction of forty-seven caissons according to plans and specifications of D. H. Burnham & Company, architects of said building; and,

"Whereas, J. C. Dumont and J. W. Vaughan have agreed to construct said caissons as subcontractors under said Goddard.

" Now, therefore, it is agreed between said J. C. Dumont and J. W. Vaughan, as parties of the first part, and said F. H. Goddard, as party of the second part, as follows:

"1. Said J. C. Dumont and J. W. Vaughan shall construct said forty-seven caissons ready to receive the columns according to said plans and specifications within sixty days from the date of delivery of the rings hereinafter mentioned for the sum of sixty-nine thousand, eight hundred and sixty-seven dollars ($69,867).   *   *   *

"10. The foregoing agreement contemplates excavation to depth of one hundred and twenty feet. If the excavation is less than one hundred and twenty feet then there shall be a rebate to Goddard of the amount of such shortage at the rate of 36 $\frac{41}{100}$ cents per cubic foot. If it becomes necessary to excavate below one hundred and twenty feet then for such extra excavation up to one hundred and thirty feet said Dumont and Vaughan shall be paid at the rate of 36 $\frac{41}{100}$ cents per cubic foot. For all work below one hundred and thirty feet the price shall hereafter be agreed upon, which price shall not exceed exact cost."

The specifications for foundations and masonry provided, among other things:

"The caissons are to be excavated to bedrock, for which purpose this contractor shall provide all necessary wood lagging, steel rings, bracings, etc. The bedrock exists on an average one hundred and twenty (120) feet beneath grade line. This contractor shall estimate on a basis of 120 feet below grade, and shall give a price per foot for additions to or deductions from this depth. * * *

"Caisson construction: This contractor shall build caisson foundations as shown on both the engineering and architect's drawings, digging to be thoroughly braced and protected until concrete piers are complete; jacks and drums to be used where necessary. Shafts to be kept straight and plumb and carried down to bedrock. This contractor shall estimate on a basis of depth of 120 feet below grade line to bedrock and shall give a price per foot for additions to or deductions from this depth."

Complainants entered upon and proceeded with the work of excavating the caissons, or wells, for the cement piers until October 20, 1906, when water and gas burst into one of the wells, which had reached a depth of over 120 feet, and the work was stopped by mutual consent. By mutual consent, a new plan was substituted for the original plan. By the new plan, which was satisfactorily executed by complainants, the concrete piers were to go down 95 feet instead of 120 feet, and were to be belled with three or four bells in each well.

October 9, 1908, the owners of the Moffat building com-

menced suit against all of the parties to this suit to recover damages for their alleged removal of lateral support. A lien is claimed in the claim of lien and in the bill for a balance of $39,879.01, with interest from February 18, 1907. The circuit court entered a decree granting a lien for the sum of $19,581.50, with interest, and appeals have been taken by both defendants. Complainants have not appealed.

Defendant Ford appeals upon the grounds:

"(1) Because the amount allowed is excessive; and
"(2) Because the claim as presented was excessive;
"(3) Because with the Moffat block suit pending, the court cannot determine whether or not there is any balance due from the owner to the principal contractor, Goddard."

Defendant Goddard appeals upon the following grounds:

"1. The trial court erred in his findings in disallowing defendant Goddard's claims against complainants.
"2. The court erred in allowing complainants' claims for extras."

With reference to the contract determining the rights of the parties, the court determined that upon the happening of the accident—

"Both architects, contractor and subcontractor at that time felt that some changes under the existing circumstances would be desirable. At the end of the four or five days, the exact time matters not, the architects had brought forth the plans, which were subsequently followed in this case, whereby the support of the building was to rest upon piers in which there were three or more bells, I think, to each pier, or caisson, as it may be called, of concrete, and this plan was adopted in lieu, I think, of the original design which contemplated going through to solid rock. I am very certain that all parties at that time recognized the impossibility for the contract price, or anything like the contract price, of the putting through of the caissons, if you may call them such, to the bedrock, and I am satisfied from the evidence that it was agreed between the parties at that time that the plan of belling, I think, as it is called, should be substituted in place of the original design of going through to bedrock. Now

under these circumstances there can be no question in my mind but what the basis of the payment for this contract should be the contract price. It is testified, I think, on behalf of both parties, of all parties, in fact, that it was represented, I think, to Vaughan and Dumont, at that time, that the contents of the bells and the concrete work to be done under the new plan was substantially the same as under the old, and I think they are entitled for any excess there may exist to claim as an extra the difference between the actual—what would have been required under the original plans—and the actual volume which they put into the piers or caissons and bells as completed."

It is conceded that there was due from Goddard to complainants a balance of $15,685, and the controversy as to the amount of complainants' claim concerns the following items, which defendants contend were either improperly allowed to complainants, or improperly charged against defendant Goddard, viz.:

|     |                   |          |
| --- | ----------------- | -------- |
| (a) | Extra concrete    | $692 45  |
| (b) | Pumping water     | 200 00   |
| (c) | Cantilevers       | 1,010 94 |
| (d) | Melchers' salary  | 969 90   |
| (e) | Hughes' salary    | 44 75    |
| (f) | Page's salary     | 14 95    |
| (g) | Alley paving      | 298 16   |
| (h) | Lost sacks        | 219 85   |
| (i) | Office expenses   | 445 50   |
|     | Total             | $3,896 50 |

(*a*) Mr. Gavier, chief engineer of construction for D. H. Burnham & Co., of Chicago, the architects of the building, testified that at the time of the substitution of the belling plan he told the parties that there would be approximately the same amount of cubical contents in both schemes. Mr. Dumont testified that Gavier said that the amount of concrete would be the same in both plans.

"And he says: 'I made it so that the amount of concrete which the bells take equals the amount that it will take to go down 120 feet.' It meant that 25 feet cut off would replace the concrete in the bells. And he says, 'I believe that you are about 53 cubic feet to the good.'

' Well,' I says, ' that won't make much difference one way
or another, and we will try to go ahead and do it.'"

Mr. Goddard testified:

"*Q.* What, if anything, was said about the substitu-
tion of this new plan for the old by you?

"*A.* Why, they said if Mr. Gavier said it was the same
thing he was satisfied. That is, we told him that included
what was already excavated, just as it stood; the whole
thing was practically equal or approximately equal to the
new system. * * *

"*Q.* And which of them said what you referred to a
moment ago in the testimony, that if the work was the
same—something of that kind?

"*A.* Dumont.

"*Q.* And what was that?

"*A.* If the contents were the same, why it was all right
with him."

It is apparent from this testimony that Mr. Dumont
understood that he would be required to fill practically
the same space with concrete under the substituted plan
as under the original. Assuming that the understanding
was that the cubical contents of the wells would be ap-
proximately the same under both plans, we do not think
that such representation was sustained by proof that there
was only 1,049 cubic feet difference in a total of 170,837
cubic feet. The word "approximately" is to be construed
with reference to the subject-matter. An estimate of the
cost of constructing a building, where uncertain factors
enter into the estimate, might well be held to be approxi-
mately correct, although the actual cost exceeded the esti-
mated cost by more than the difference in this case. But
where, as in this case, the problem is a mathematical one
of figuring the cubical contents of figures of definite dimen-
sions admitting of accurate results, we agree with the cir-
cuit judge that the representation cannot be said to be
approximately correct.

It is urged, however, that under the substituted plan
the amount of excavation would be lessened by 13,331
cubic feet of 2-inch lagging required under the first plan.

Under the original plan, the 2-inch lagging lining the wells was to be left in. Under the substituted plan complainants were required to remove it. This order was complied with by complainants, and, according to Mr. Dumont, increased their work and prevented their working to the best advantage. The new arrangement was with reference to the space which complainants would have to fill with concrete; and the amount which they might gain and the added difficulties they might meet, otherwise than in the amount of concrete, were not considered except as, perhaps, they might be thought to offset each other. Mr. Gavier testified:

"*Q.* Was it not your understanding—I ask you in a fair way—your interpretation of what was said there, that they were to go ahead on the representation of there being the same number of cubic feet of concrete, at the contract price?

"*A.* Why, I certainly had that impression; yes, sir.

"*Q.* Now do you know, and did you prepare any figures—

"*The Court:* Do you mean to say that is, according to your recollection, the substance of your conversation that then took place?

"*A.* Yes, sir."

We, therefore, agree with the circuit judge that complainants were entitled to compensation for the extra concreting at the price adopted from the testimony of Mr. Dumont.

(*b*) The only pumping of water for which complainants were entitled to charge under their contract, in our opinion, relates to the water which Dumont testified flooded the basement through Mr. Goddard's taking up the curbstone and the acts of Hughes', the basement contractors', men digging holes through the clay banked up around the caissons to protect them. It appears from Mr. Goddard's testimony that he gave orders to Mr. Hughes' men with reference to starting the grillage, and, in the absence of evidence to the contrary, we do not think the record justifies a finding that the flooding of the wells arose from

the acts of an independent contractor, even if this would protect Goddard, if he was responsible for flooding the basement. We therefore agree with the conclusion of the circuit judge as to this item.

(c) The contract between Ford and Goddard provided:

"Steel in foundations: The steel erecting contractor shall deliver the grillage beams to the building, which the masonry contractor shall set in place. All other steel work in the foundations shall be set in place by the steel erecting contractor, the masonry contractor enclosing and completely encasing same with concrete as shown by the drawings, and herein specified."

The proposal of Dumont of August 29, 1906, to construct the caissons for $71,280 contained the following:

"This figure includes all material and labor for setting iron up to base of columns and cantilevers. Iron to be furnished by other contractor."

His proposal of September 1st, which was accepted, was as follows:

"My revised figure for the caissons, learning the thickness of lumber for lagging, is $69,867. The contents of my previous letter of August 29, '06, are to be the same."

On February 23, 1907, the architects wrote the following letter to complainants:

"Gentlemen: The digging of the 47 caissons of the Ford building have been completed, and we wish to say that you have given us a very excellent concrete job. We feel perfectly certain that our foundations are O. K. in every respect. This includes the setting of the grillage."

In view of complainants' proposal and the acceptance of the caissons as completed by the architects, we think the court properly construed the contract between complainants and Goddard as not requiring them to encase certain cantilever beams in concrete. As to the other items, we agree with the findings of the circuit judge, without further discussion.

An examination of the long record has satisfied us of

the correctness of the finding of the circuit judge that, notwithstanding the disparity between the claim as filed and the amount found due, the excessive claim was made and filed in good faith, and therefore should not bar the attaching of the lien.

Does the pendency of the suit for damages prevent a final determination ? Goddard, by his contract, assumed the obligation to indemnify Ford against such liability as is involved in the suit by the owners of the Moffat building, but we find no such contractual obligation on the part of complainants to protect Goddard against liability. The facts as disclosed by this record, in the absence of contractual liability, do not indicate any liability on the part of complainants to either Ford or Goddard. The plans and specifications of the original and substituted schemes were prepared for the owner by an engineer of wide experience and unquestioned eminence in his profession, and by their contract complainants were subject to the directions of the architects and executed the work to their satisfaction, as evidenced, among other things, by their final certificate approving the work.

The important question, therefore, for determination, is: Does the contingent liability of Goddard to Ford operate to prevent or postpone the determination of the amount of complainants' lien against the building ? We agree with the contention of counsel for complainants that our statute (3 Comp. Laws, §§ 10710–10745) provides for a direct lien in behalf of the persons entitled thereto and not one by subrogation to the rights of the contractors, and that they are therefore not bound by the stipulations of the original contract as to liens or the amounts to be paid thereon, except as to the amount of the contract price. *Smalley* v. *Gearing*, 121 Mich. 190 (79 N. W. 1114, 80 N. W. 797); *Clough* v. *McDonald*, 18 Kan. 114.

The same statute, however, which gives the lien provides:

" The owner, part owner, or lessee shall not be liable to the subcontractor, materialmen or laborers, for any

greater amount than he contracted to pay the original con-
tractor and shall be entitled to recoup any damages which
he may sustain by reason of any failure or omission in the
performance of such contract." 3 Comp. Laws, § 10710.

This statute limits the amount of the liens of subcon-
tractors, etc., to the amount legally due under the original
contract, after deducting from the contract, among other
proper items of credit, such damages as may be awarded to
the owner "by reason of any failure or omission in the
performance of such contract." *J. E. Greilick Co.* v.
*Rogers*, 144 Mich. 313 ( 107 N. W. 885).

The answer of defendant Ford makes no reference to a
threatened suit, nor was it amended after the institution
of the damage suit to state that fact. The only reference
in the answer to complainants' right to a lien is contained
in paragraph 12, as follows :

"*Twelfth.* This defendant further answering shows
that he is advised that the complainants are not entitled
to a lien upon said premises for the work and labor
alleged to have been performed by them, and therefore
denies that complainants are entitled to the relief prayed
for in their bill of complaint, and therefore prays that the
bill of complaint may be dismissed, and that this defend-
ant may be awarded his reasonable costs and charges, in
this behalf most wrongfully sustained."

The answer of defendant Goddard refers to a threatened
suit and by amendment there was added the following :

" That said owners of said Moffat building have, since
the answer of defendant Goddard was filed in this cause, be-
gun said threatened suit alleging damages, $200,000,
which said suit is now pending in this court; and this de-
fendant asks this court in this cause to stay all proceed-
ings by complainants for the collection of any part of said
amount this defendant admits is owing by him to com-
plainants, and from the collection of any of whatever sum
of money may be decreed complainants in this suit, until
said damage suits against this defendant above referred to
have been completed, and until all damages awarded
therein have been fully paid."

The brief for defendant Goddard does not discuss the

question presented by his answer only, of the effect of the damage suit. The question is argued at length in the brief for defendant Ford, whose answer presents no such question. The proofs in this record would not have sustained an allegation of a failure or omission in the performance of the contract, so far as the execution of the work was concerned, but, on the contrary, the evidence demonstrates to our satisfaction that, so far as the parties to this suit were concerned, the contract was fully performed.

The decree is affirmed, with costs to complainants.

MOORE, McALVAY, BROOKE, and STONE, JJ., concurred.